COVINGTON, Judge.
This is a suit for damages allegedly incurred by plaintiff, Ferdy George Patterson, as a result of his being shot by defendant, Clarence Jackson, a police officer of the City of Donaldsonville. Plaintiff alleged that he was shot at about 3:00 a. m. on March 5, 1979, as he answered the door of a mobile home owned by Curtis Dixon, with whom plaintiff was visiting at the time. Plaintiff seeks damages in the amount of $95,000.00 for his injuries from Jackson and the City of Donaldsonville, claiming that the shooting constituted an intentional tort. Plaintiff further alleged that at the time of the shooting, Jackson was acting as a police officer for the City, thereby making it, as his employer, also responsible for plaintiff’s injuries. Defendants answered, denying the allegations of the petition, and averring that all actions taken by Jackson in the incident were “prudent and completely justified under the circumstances.”
Thereafter, plaintiff amended his petition to include the City’s insurer, Western Surety Company, as a defendant, alleging that the insurer had issued a bond insuring the City from liability caused by the negligence and/or improper conduct of its employees. In response to the amending petition, the insurer filed a peremptory exception to the effect that plaintiff had no cause of action against the insurer because the bond issued by it was an “Honesty Blanket Bond” which did not provide insurance coverage for the circumstances alleged. The trial court sustained the exception, dismissing the insurer from the suit. This judgment was not appealed by the plaintiff.
Subsequently, trial was held before the trial court, resulting in a judgment in favor of the defendants dismissing plaintiff’s suit. Plaintiff has appealed this judgment.[1] We affirm.
The trial court found the following facts:
*358 “The parties do not dispute that on the night of March 4, 1979 and into the early morning hours of March 5, 1979, the plaintiff, along with two other individuals named Ray Wilson and Wayne Murray, were visiting Curtis Dixon at his two bedroom mobile home on Pine Street in Don-aldsonville. Some time after midnight, the parties at the mobile home decided to go to bed. Curtis Dixon slept in his bedroom near the front of the mobile home and Ray Wilson and Wayne Murray retired to the rear bedroom at the opposite end of the mobile home. The plaintiff, Ferdy George Patterson, slept on the couch in the living room which was next to Dixon’s front bedroom. The mobile home also contained a kitchen and bathroom which were located between the living room and the back bedroom. At about 1:30 a. m. that night, an individual named Clinton Riley came to the mobile home searching for Wayne Murray. Curtis Dixon and the plaintiff told Riley that Murray was sleeping in the rear bedroom and would not be disturbed. An argument and a small fight broke out between the plaintiff and Riley. Dixon stopped the fight and put Riley out of the mobile home.
“The parties were not in agreement as to what happened after Riley left the mobile home. The story presented by the plaintiff and his witnesses (Curtis Dixon, Ray Wilson and Grady Lewis) is completely different from that testified to by Officer Jackson and his witnesses (Officer Charles Ray Myles, Clinton Riley, Carl Williams and Detective Robert LeBlanc, Jr.). The testimony of the plaintiff and his witnesses can be summarized as follows:
“The plaintiff testified that after Clinton Riley left the mobile home, he went to the bathroom, and while in the bathroom, he heard a knock at the door and heard Curtis Dixon talking to whoever had knocked. He stated, however, that whoever had come to the door had left by the time he came out of the bathroom. The plaintiff further testified that a short time after he returned to the living room from the bathroom, there was another knock at the door and that he proceeded to answer the door. It was his testimony that as he was in the process of opening the door and had opened it a little, but not enough to see who was there, a shot was fired through the door near his head. He stated that he dropped to the floor and then a second shot was fired through the door. The plaintiff further testified that the second shot struck him in the lower back and exited his body at his chest, damaging his liver, one of his kidneys and one of his lungs in the process. He stated that after the two shots were fired, someone in the mobile home informed the officers outside that he had been hit by one of the shots. The plaintiff was not certain as to what happened thereafter, except that an ambulance arrived and he was taken to a local hospital and soon transferred to Earl K. Long Hospital in Baton Rouge. He stated that he was hospitalized for several months after the shooting, that he continues to have several physical problems as a result of the shooting and that he has not been able to return to work since the shooting.
“On cross-examination, plaintiff stated that he did not see Officer Jackson nor did he leave the mobile home prior to the time he was shot. He admitted, however, that he has been convicted of assault and battery of one of the officers on the night in question. He also testified that his conviction is presently being appealed. Although plaintiff denied having a gun in his possession on the night he was shot, he admitted that Curtis Dixon did in fact own a .357 magnum pistol at that time.
“Curtis Dixon, testifying on behalf of the plaintiff, stated that a short time after Clinton Riley left the mobile home, there was another knock on the door. He answered the door in his underwear and stated that Officer Jackson and Officer Charles Myles were inquiring about the earlier disturbance at the mobile home. He further, testified the officers became convinced that things were now peaceful at the mobile home, and said, ‘No, it don’t look like no disturbance over here’ and then turned around and left. He stated that he then went back to his bedroom and put his pants *359 on ‘to sit up’ for a while, since the officers had awakened him. It was his testimony that a few minutes later, there was another knock at the door, and that this time, the plaintiff, Ferdy George Patterson, answered the door. He stated that as soon as plaintiff pushed the door open a little, two shots were fired through the door, the second of which struck the plaintiff.
“On cross-examination, Dixon denied that he was told by the officers when he first answered the door to put his pants on and came outside for questioning. He even denied that he had testified to that effect at the earlier criminal proceeding against plaintiff, although the relevant parts of the transcript of the criminal trial, which were introduced into evidence, showed otherwise. He further stated that from his bedroom he could see plaintiff at all times between the time Riley left the mobile home and the time plaintiff got shot, and that during that period of time, plaintiff did not leave the mobile home. He admitted that he owned a .357 magnum pistol which was in the mobile home on the night in question, but denied that the plaintiff ever had possession of the same. He further stated that when he was shot, plaintiff had on a pair of pants, a shirt and an undershirt; but he was definite in his testimony that plaintiff did not have a jacket [on] when he was shot.
“Ray Wilson also testified for the plaintiff. Although he indicated that he was in the mobile home during the entire time in question, he admitted that he was in the back bedroom when plaintiff was shot and did not witness the shooting nor the events immediately prior thereto.
“Mary Patterson, plaintiff’s mother, testified about her care of her son subsequent to his release from the hospital after he was shot.
“Plaintiff’s final witness was Grady Lewis who lived and was present in the mobile home next door to Dixon’s mobile home on the night in question. Lewis testified that on the night in question, he was awakened by some noise which sounded like arguing going on outside nearby, and that, a few minutes later, a shot was fired. He stated that he ran to his window and saw Officer Jackson fire a second shot. He further stated that when he looked outside, the only person he saw was Officer Jackson. He admitted, though, that he was not looking out his window when the first shot was fired and therefore could not testify as to whether or not the plaintiff was outside the mobile home when the first shot was fired.
“On the other hand, the testimony of Officer Jackson and his witnesses is entirely different. Officer Jackson testified that on the night in question, he was on patrol with Officer Charles Myles when their radio dispatcher requested that they check out a disturbance on Pine Street in Donaldson-ville. In response to the radio message, they proceeded to routinely circle the block near the address in question, and in doing so, they met Mr. Carl Williams who informed them that he had made a complaint that someone had fired shots at him from the Dixon mobile home. Mr. Williams, testifying for the defendants, stated that Mr. Clinton Riley had approached him for help in finding his car keys which had been supposedly lost in the Dixon mobile home when Riley had earlier been there, and that as Williams approached the Dixon mobile home on Riley’s behalf, he was fired upon, prompting him to file the complaint.
“After encountering Williams, Officers Jackson and Myles testified that they proceeded with Williams to search for Clinton Riley, who was subsequently found nearby. After Riley, who also testified at the trial, told them substantially the same story that had been told to them by Williams, Officers Jackson and Myles proceeded to the residence in question to continue their investigation. They both testified that they knocked on the door and Curtis Dixon answered. However, since he was in his underwear, they asked him to put on some clothes and then come out for questioning about the earlier incident. As Dixon returned inside to get dressed, the officers testified that the plaintiff, Ferdy George Patterson, came out of the mobile home and asked what was going on. They told him *360 that they wanted to question the occupants of the mobile home about the Williams’ complaint, and requested that he submit to a body search. The plaintiff refused and resisted the officers’ attempt to frisk him and a scuffle ensued. Both Officers and Clinton Riley, who was observing from a distance, testified that during the scuffle, the plaintiff tried to grab the Officers’ pistols and also several times seemed to be trying to get something from under his jacket near his waist. At one point during the scuffle, Officer Myles struck the plaintiff with the butt of his shotgun, and testified that, in doing so, his shotgun struck a hard object under the plaintiff’s jacket, resulting in a crack in the handle of his shotgun. The shotgun with its cracked handle was introduced into evidence. The Officers further testified that the plaintiff managed to escape from their grasps and retreated to the steps of the mobile home a few feet away. While on the steps, it was the testimony of Officer Jackson that the plaintiff was able to pull a pistol from under his jacket and that the plaintiff then pointed the pistol in his direction. Officer Myles, although admitting that he did not actually see the gun in the plaintiff’s hand, testified that he realized what was about to happen when the plaintiff made it back to the steps alone and began what looked like an attempt to take something out from under his jacket. Realizing what was forthcoming, Officer Myles testified that he was able to get cover around the side of the mobile home, a few feet away from him. Officer Jackson testified that he shot two shots at the plaintiff with his pistol a few moments after the plaintiff pointed the gun at him, the first shot directly at the plaintiff, hitting him, and the second shot a little higher up as a warning shot to enable him to obtain cover. Officer Jackson was thereafter able to join Officer Myles at the patrol car. They called out for the other occupants of the mobile home to exit. Curtis Dixon and Wayne Murray came out. Officer Jackson testified that he was then able to reach inside the mobile home near the front door and take a .357 magnum pistol from the floor just inside the door. He returned to the patrol car and after questioning Curtis Dixon, learned that there were other weapons in the mobile home. Since there were other weapons inside, Officer Jackson called his headquarters for assistance and waited until his assistance arrived before attempting to enter the mobile home. Soon a sheriff’s deputy and detective arrived, and the four police officers entered the mobile home and found the plaintiff who had been shot lying near the door. They apprehended Ray Wilson from the rear bedroom, and after calling an ambulance for the plaintiff, conducted a thorough search of the premises. Detective Robert LeBlanc testified that his search resulted in several weapons being confiscated from the mobile home. The .357 magnum pistol seized by Officer Jackson was introduced into evidence. Both the plaintiff and Curtis Dixon identified the weapon as being Dixon’s.”
We have carefully reviewed the testimony and evidence in the record and find that they support the factual findings of the trial court. According to the testimony of the police officers, plaintiff managed to escape their attempt to effect a body search and fled to the mobile home. When plaintiff reached the door of the mobile home, he pulled a handgun from his pants and pointed the weapon at the officers. One of the officers was able to seek cover, but Jackson was unable to do so. However, to protect himself, he fired twice at the armed plaintiff, with the first roünd striking the plaintiff, causing the injuries complained of. Officer Myles’ testimony fully corroborates that of Jackson as to the entire incident. The testimony of Riley and Williams, called as witnesses for defendants, supported Jackson’s testimony regarding the initial disturbance at the mobile home. The officers and Riley testified that during the scuffle which ensued when the officers tried to frisk Patterson, plaintiff tried to remove an object from the waistband of his pants and also tried to disarm the officers. The facts clearly establish that Patterson pointed a pistol at the officers before Jackson fired at him.
*361 Based upon its finding of fact set out above, the trial court held in favor of the defendants, stating:
“Since the stories told by the respective parties are completely different, the Court must decide which story is the most credible. After carefully considering the applicable law and the evidence introduced, including the appearance and demeanor of the witnesses on the stand, it is the opinion of the Court that the evidence preponderates in favor of the defendants and against the plaintiff for several reasons. The plaintiff really had only one witness to corroborate his story of the events leading up to and including the shooting, that being Curtis Dixon. However, Dixon’s testimony was not completely flawless and therefore not totally credible. Although Dixon insisted that he had full view of and was able to see the plaintiff at all times prior to his being shot, he testified that the plaintiff did not have a jacket on when he was shot. The testimony was clear, however, that the plaintiff did in fact have a jacket on when he was shot. The jacket with its bullet holes was introduced into evidence and it was stipulated between counsel that the plaintiff was indeed wearing the same when he was shot. Furthermore, the testimony presented by Dixon as to what was said to him by the officers when they first appeared at the mobile home is different from the testimony given by him at the earlier criminal proceeding against the plaintiff, as indicated above. Also, if Dixon’s testimony at this trial that the Officers left saying, ‘There is no disturbance here,’ were true, then there would have been no reason for them to stay there and a few minutes later shoot the plaintiff. They would have simply left the scene.
“The plaintiff’s credibility must also be questioned. His story was that the shots were fired even before he opened the door of the mobile home and therefore there was no reason for the shots to be fired. The Court finds it hard to believe that a duly trained police officer would have simply fired two shots through the door of the mobile home for absolutely no reason at all. Furthermore, as indicated above, the plaintiff had a shirt and jacket on when he was shot. On rebuttal, the plaintiff testified that he put the jacket on when he heard the knock on the door which he responded to and was ultimately shot while in the process of opening the door. The Court finds it difficult to believe that the plaintiff would have put on both his shirt and jacket before he actually opened the door. It is the opinion of the Court that the plaintiff would not have had a shirt and jacket on at the time he was shot had he not been outside the mobile home immediately prior thereto, as testified to by Officer Jackson and his witnesses.
“Also the evidence was undisputed that there was a .357 magnum pistol in the mobile home at the time in question that the plaintiff could have had access to. It was likewise not disputed that the plaintiff has been convicted of assault and battery of the officers on the night in question, although said conviction is presently on appeal. However, the Court does not even have to consider the plaintiff’s conviction as a basis for ruling in favor of the defendants. The plaintiff’s story is simply not as believable as that of the defendants.
“Unlike the plaintiff’s witnesses, Officer Jackson and his witnesses were more certain and straight-forward in their testimony. The Court finds that although Officer Myles was able to get cover around the side of the mobile home when the plaintiff was about to pull the gun from his waistband, Officer Jackson was not so fortunate. He found himself faced with a head to head confrontation with the plaintiff pointing a gun at him at point-blank range. He was out in the open. He was threatened with death or serious injury. He had no choice but to shoot. He did not have to wait for the plaintiff to shoot first. He knew from his earlier conversations with Carl Williams and Clinton Riley that shots had been earlier fired from the mobile home. The court finds that as the plaintiff was attempting to use the mobile home door *362 as a shield, Officer Jackson shot twice, first directly at the plaintiff, hitting him, and secondly higher up in order , to give him enough time to seek protective cover, which he was subsequently able to do. According to the evidence presented, the Court finds that it was physically possible for the plaintiff to get shot in the manner testified to by Officer Jackson and his witnesses. Officer Jackson had one and only one shot at the plaintiff. It cannot be said that he acted unreasonably under the circumstances. Therefore, neither he •nor his employer are liable for the injuries and damages the plaintiff has allegedly suffered. Since the plaintiff has failed to prove liability, the Court does not pass on the issue of the extent of his alleged damages.
“Hence, the law and evidence is in favor of the defendants and against the plaintiff and therefore it is ordered, adjudged and decreed that the plaintiff’s suit be dismissed with prejudice at his costs.”
We agree with the trial court’s holding. In Kyle v. City of New Orleans, 353 So.2d 969, 973 (La.1977), the court said:
“Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case. A court must evaluate the officers’ actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers. Picou v. Terrebonne Parish Sheriff’s Office, supra; 6A C.J.S. Arrest § 49(a), p. 112; 6A C.J.S. Assault and Battery § 97, p. 491. The degree of force employed is a factual issue. Picou v. Terrebonne Parish Sheriff’s Office, supra; Castriotta v. Cronvich, La.App., 277 So.2d 744 (1973); Espenan v. Carona, La.App., 179 So. 119 (1938). As such, the trial court’s finding is entitled to great weight. Canter v. Koehring Co., La., 283 So.2d 716 (1973).
“Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee’s escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment. See Picou v. Terrebonne Parish Sheriff’s Office, supra; Logan v. Swift, La.App., 327 So.2d 168 (1976); Crawford v. Maryland Casualty Co., La.App., 169 So.2d 612 (1964); Restatement (Second) of Torts, Volume 1, § 132, comment c, p. 237 (1965); Comment, Tort Liability of Law Enforcement Officers: State Remedies, 29 La.L.Rev. 130.”
Thus, it is clear that when the reasonableness of the force used by the police in the exercise of its duty is at issue, the court must look at the “totality of the facts and circumstances” in the particular case. See Picou v. Terrebonne Parish Sheriff’s Office, 343 So.2d 306 (La.App. 1 Cir. 1977), writ denied, 345 So.2d 506 (La.1977). In the absence of manifest error, the finding of the trial court on the factual issue of the degree of force employed must be accorded great weight. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Stark v. Town of Merryville, 396 So.2d 569 (La.App. 3 Cir. 1981), writ denied, 399 So.2d 621 (La.1981).
For the foregoing reasons, the judgment of the trial court is affirmed at plaintiff-appellant’s costs.
AFFIRMED.

. Defendant Jackson died after trial of this case. No substitution of parties was made. On argument date, October 16, 1981, plaintiff’s counsel moved to dismiss the appeal as to Jackson and a written motion and order of dismissal was signed 3 days later.